******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# REDDING LIFE CARE, LLC *v.* TOWN OF REDDING
## (SC 20054)

Robinson, C. J., and Palmer, D'Auria, Ecker and Lavine, Js.

*Syllabus*

Pursuant to this court's decision in *State* v. *Curcio* (191 Conn. 27), an interlocutory court order or ruling may be immediately appealable if the order or ruling either terminates a separate and distinct proceeding, or so concludes the rights of the parties that further proceedings cannot affect them.

The plaintiff in error, S, filed a writ of error, seeking review of the trial court's denial of his motion for a protective order in connection with the issuance of a subpoena compelling him to appear at a deposition. S had appraised certain real property that was the subject of a tax appeal. The appraisals had been performed prior to and independently of the tax appeal, to which S was not a party. During the pendency of the tax appeal, the defendant in error, the town of Redding, which was defending the tax appeal, served S with a subpoena compelling him to appear at a deposition in Florida, where S resided at that time. S filed the motion for a protective order in the trial court, seeking to prohibit the taking of the deposition. In support of his motion, S contended that he had not been retained by either party in the tax appeal, did not have any relevant knowledge, and could not be compelled to testify as an expert because Connecticut law prohibited the compulsion of testimony from an unretained expert. In denying S's motion, the trial court ordered the deposition to proceed. After S filed his writ of error with this court, the town filed a motion to dismiss the writ of error for lack of subject matter jurisdiction on the ground that the trial court's order was not a final judgment. This court then transferred the writ to the Appellate Court, which denied the town's motion to dismiss. The Appellate Court ultimately granted the writ of error, basing its decision on the creation of a new, qualified testimonial privilege for unretained expert witnesses. The Appellate Court remanded the case to the trial court with direction to vacate its order denying the motion for a protective order and for a determination as to whether S's proposed deposition testimony was barred under that privilege. The town thereafter filed a petition for certification to appeal from the Appellate Court's judgment, which this court granted. *Held*:

1. Contrary to S's claim, this court had subject matter jurisdiction to grant the town's petition for certification to appeal from the Appellate Court's judgment on the writ of error: subsections (a) and (b) of the statute (§ 51-199) governing the jurisdiction of this court clearly and explicitly grant to this court final and conclusive jurisdiction over writs of error, and, although the plain language of subsection (c) of § 51-199 expands the jurisdiction of the Appellate Court to include writs of error upon transfer from this court, no language in that subsection expressly divests this court of final jurisdiction over writs of error or remotely suggests that this court, upon transferring a writ of error to the Appellate Court, loses its authority to make the final determination concerning a writ of error; moreover, an appeal, for purposes of the statute (§ 51-197f) governing petitions for certification to appeal, clearly and unambiguously encompasses review of a lower court's decision that is tantamount to an appeal from a final judgment, and a judgment on a writ of error that has been transferred from this court to the Appellate Court is tantamount to an appeal, as the language in § 51-199 strongly indicates that the legislature did not intend for the Appellate Court to be the court of last resort with respect to the review of trial court orders that give rise to writs of error, and writs of error and appeals have many features in common, as both must be taken from final judgments, must conform to the appellate rules of practice, and are prosecuted, briefed and argued in the same manner; furthermore, although an appeal is the means by which a party may seek review of a final judgment and a writ of error is the means by which a nonparty may seek such review, there is no distinction between a writ of error and an appeal that justifies treating

them differently for purposes of § 51-197f.

2. The Appellate Court lacked subject matter jurisdiction over the writ of error because writs of error may be brought only from final judgments and the trial court's interlocutory order directing the deposition of S to proceed did not constitute an appealable final judgment under *Curcio*: the trial court's discovery order did not terminate a separate and distinct proceeding because that order was not sufficiently definite, specific or comprehensive, as the court, in issuing its order, did not rule on any specific questions the parties would ask of S at the deposition, and, insofar as those specific questions were unknown, it could not be determined whether any privilege would apply to S's prospective deposition testimony; moreover, S could not prevail on his claim that there could be no further proceedings before the trial court that could affect him, as he could be held in contempt by a Connecticut court for failing to comply with the subpoena because he sought a protective order from the Connecticut Superior Court and the discovery order was the byproduct of his having sought aid from the Connecticut court system, and requiring S to appeal from a contempt order did not violate justice or public policy but, rather, ensured that there would be a live controversy in which his legally protected interest has been adversely affected; accordingly, the Appellate Court's judgment was reversed and the case was remanded with direction to dismiss S's writ of error.

Argued November 14, 2018—officially released May 21, 2019

*Procedural History*

Writ of error from an order of the Superior Court in the judicial district of New Britain, *Schuman, J.*, denying a motion for a protective order filed by the plaintiff in error, brought to this court, which transferred the matter to the Appellate Court, *DiPentima, C. J.*, and *Prescott* and *Beach, Js.*; judgment granting the writ of error and remanding the case to the trial court for further proceedings, from which the defendant in error, on the granting of certification, appealed to this court. *Reversed*; *judgment directed*.

*Elliott B. Pollack*, with whom were *Michael J. Marafito* and, on the brief, *Johanna S. Katz*, for the defendant in error (town of Redding).

*Proloy K. Das*, with whom were *Robert E. Kaelin* and, on the brief, *Melissa A. Federico*, for the plaintiff in error (David R. Salinas).

*James J. Healy* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Michael R. McPherson* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Roderick R. Williams*, deputy corporation counsel, filed a brief for the city of New Haven as amicus curiae.

*Opinion*

D'AURIA, J. In this certified appeal, we are asked to determine whether there exists either an absolute or qualified testimonial privilege for an unretained expert who previously has rendered an opinion relevant to the issues in a pending case. The defendant in error, the town of Redding (town), appeals from the judgment of the Appellate Court, which granted the writ of error filed by the plaintiff in error, David R. Salinas. In granting the writ, the Appellate Court vacated the trial court's order denying his motion for a protective order that sought to prohibit the town from taking his deposition and ordered the trial court to determine whether Salinas' testimony was privileged under the new, qualified unretained expert privilege that the Appellate Court announced. To reach this issue, however, this court must overcome two jurisdictional hurdles: (1) whether this court has jurisdiction to grant certification to appeal from the Appellate Court's determination of a writ of error, and (2) whether the trial court's ruling constituted an appealable final judgment. Although we determine that we have jurisdiction to grant certification, we nevertheless determine that there was no appealable final judgment.[1] Accordingly, we reverse the judgment of the Appellate Court and direct that court on remand to dismiss the writ of error for lack of a final judgment.

The following undisputed facts and procedural history are relevant to our review of these claims. In October, 2012, the town assessed real property owned by Redding Life Care, LLC (Redding Life). As a result of that assessment, Redding Life initiated an action against the town to challenge the assessed value of the property (tax appeal). Prior to the initiation of that action, in 2010 and 2011, Salinas had completed two appraisals of that property on behalf of CapitalSource Bank (bank), a nonparty to the tax appeal, as part of the underwriting process for extending a loan to Redding Life in 2011. In July, 2014, after learning about and obtaining copies of these appraisals through the pretrial discovery process, the town filed a motion for a commission to depose Salinas, who resided in Florida. Redding Life and the bank objected. The trial court, *Hon. Arnold W. Aronson*, judge trial referee, granted the town's motion.

Subsequently, the town served Salinas with a subpoena compelling him to appear at a deposition scheduled for January, 2015, in Florida. Salinas filed a motion for a protective order in the Connecticut Superior Court seeking to prohibit the town from taking his deposition. He argued that he had not been retained in the tax appeal, did not have any relevant knowledge, and could not be compelled to testify as an expert because Connecticut law "prohibit[s] the compulsion of such unretained expert testimony." The town objected.

The court denied Salinas' motion and ordered the following: "The deposition shall proceed. The town shall pay the witness his fees and expenses as provided in Practice Book § 13-4 (c) (2). The town shall enter into any reasonable protective order proposed by the witness or the other parties designed to limit the use of the information obtained in the deposition to this case only." Salinas then filed a writ of error with this court seeking appellate review of the trial court's denial of his motion for a protective order. Salinas subsequently filed a motion seeking the following articulation: "Did the trial court conclude that . . . Salinas can be compelled under Connecticut law to provide expert witness testimony against his will? If so, what is the basis for that conclusion?" The court responded: "The answer to the first question is no. It was unnecessary to reach that conclusion because [Salinas] had already authored appraisals that contained his opinions."

The town thereafter filed a motion to dismiss the writ of error for lack of subject matter jurisdiction, arguing that the trial court's discovery order did not constitute an appealable final judgment. This court transferred the matter to the Appellate Court pursuant to General Statutes § 51-199 (c), and that court denied the town's motion to dismiss. *Redding Life Care, LLC* v. *Redding*, 174 Conn. App. 193, 196, 165 A.3d 180 (2017).

The Appellate Court granted the writ of error and remanded the case to the trial court with direction to vacate the order denying the plaintiff in error's motion for a protective order. Id., 206. The Appellate Court based its decision on its creation of a new, qualified unretained expert privilege that it announced. Id., 205. In defining the parameters of this privilege, the Appellate Court explained that, on remand, the trial court "should, in determining whether to grant Salinas' motion for a protective order because his testimony is appropriately barred by the qualified unretained expert privilege, consider (1) whether, under the circumstances, he reasonably should have expected that, in the normal course of events, he would be called upon to provide opinion testimony in subsequent litigation; and (2) whether there exists a compelling need for his opinion testimony in this case. Additional considerations may be relevant to the analysis, including, for example, whether he was retained by a party with an eye to the present dispute." Id., 205–206.

The town filed a petition for certification to appeal, which we granted, limited to the following issues: "1. Does Connecticut recognize a qualified expert testimonial privilege in pretrial discovery (and at trial) permitting an unretained expert to withhold testimony regarding an opinion that the expert has previously rendered and documented in a written report? 2. If Connecticut recognizes this privilege, what is its scope? 3. Does the Supreme Court have jurisdiction to grant

certification to appeal from the Appellate Court's final determination of a writ of error?" *Redding Life Care, LLC* v. *Redding*, 327 Conn. 991, 992, 175 A.3d 1247 (2018). Following oral argument, however, this court requested that the parties file supplemental briefs on the issue the Appellate Court had previously passed upon: whether there was an appealable final judgment. Additional facts will be set forth as necessary.

I

Initially, we must resolve Salinas' challenge to this court's subject matter jurisdiction to grant certification to appeal from the Appellate Court's judgment on his writ of error, which was originally filed with this court but transferred to the Appellate Court pursuant to § 51-199 (c). We conclude that we have such jurisdiction.

Salinas argues that by transferring the case to the Appellate Court, this court lost jurisdiction over his writ of error. Specifically, he argues that, in the absence of a transfer of the writ of error back to this court, § 51-199 (c) provides no procedure by which this court may later review the Appellate Court's judgment on a transferred writ of error.[2] He further contends that even if this court retains jurisdiction over his transferred writ of error, it lacks jurisdiction to grant certification to appeal pursuant to General Statutes § 51-197f because that statute applies only to appeals, not writs of error. The town counters that, pursuant to § 51-199 (a), this court has "final and conclusive" jurisdiction over all writs of error, even those transferred to the Appellate Court, and that we should interpret the term "appeal" in § 51-197f broadly to encompass the judgment of the Appellate Court on a transferred writ of error. We agree with the town.

"It is axiomatic that, except insofar as the constitution bestows upon this court jurisdiction to hear certain cases . . . the subject matter jurisdiction of the Appellate Court and of this court is governed by statute." (Internal quotation marks omitted.) *Banks* v. *Thomas*, 241 Conn. 569, 582, 698 A.2d 268 (1997); see also *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983) ("The right of appeal is purely statutory. It is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met."). In the present case, whether this court may grant certification to appeal from a judgment of the Appellate Court on a transferred writ of error requires us to analyze the interplay between two statutes—§ 51-197f, regarding certification to appeal and § 51-199, regarding the Supreme Court's authority over writs of error.

"When construing a statute . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and

does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Callaghan* v. *Car Parts International, LLC*, 329 Conn. 564, 570–71, 188 A.3d 691 (2018). In determining whether the statutory language is plain and unambiguous, "words and phrases [must] be construed according to the commonly approved usage of the language . . . . General Statutes § 1-1 (a). We ordinarily look to the dictionary definition of a word to ascertain its commonly approved usage." (Internal quotation marks omitted.) *State* v. *Gelormino*, 291 Conn. 373, 380, 968 A.2d 379 (2009). Additionally, we must construe the statute in conformity with prior case law interpreting it. See *State* v. *Moreno-Hernandez*, 317 Conn. 292, 299, 118 A.3d 26 (2015) ("[i]n interpreting the [statutory] language . . . [we] are bound by our previous judicial interpretations of the language and the purpose of the statute" [internal quotation marks omitted]). If, however, after examining the ordinary meaning of the words used in the statute and considering their meaning in light of prior cases interpreting the statute, "the statutory text at issue is susceptible to more than one plausible interpretation, we may appropriately consider extratextual evidence." (Internal quotation marks omitted.) *Callaghan* v. *Car Parts International, LLC*, supra, 571.

First, we must determine whether this court loses jurisdiction over a transferred writ of error in the absence of a motion to transfer it back to this court after the Appellate Court has issued a decision on the writ of error and the matter no longer is pending before the Appellate Court. We conclude that we have not lost final jurisdiction.

Section 51-199 contains four subsections, only three of which are relevant to our analysis. Subsection (a) provides that "[t]he Supreme Court shall have *final and conclusive jurisdiction* of all matters brought before it according to law, and may carry into execution all its judgments and decrees and institute rules of practice and procedure as to matters before it." (Emphasis added.) Subsection (b) then specifies which matters must be brought directly to the Supreme Court according to law, including writs of error. See General Statutes § 51-199 (b) ("[t]he following matters shall be taken directly to the Supreme Court . . . writs of error"). This statutory provision codifies the historical and well established common-law rule that "this court [has] common-law jurisdiction over writs of error . . . ." *State* v. *Skipwith*, 326 Conn. 512, 521, 165 A.3d 1211 (2017); see also *State* v. *Assuntino*, 173 Conn. 104, 110–12, 376 A.2d 1091 (1977) ("It is clear that the common-law writ of error was adopted by Connecticut as part of its own common law. No statute has expressly abrogated that law. . . . [T]he writ, at common law, lies to this court from a judgment of the Court of Com-

mon Pleas." [Citations omitted.]). Thus, when a writ of error is filed with this court—as this one was—subsections (a) and (b) of § 51-199 together clearly and explicitly grant this court "final and conclusive jurisdiction" over it.

Finally, subsection (c) of § 51-199 permits the Supreme Court to transfer "causes," including writs of error, from itself to the Appellate Court and, conversely, from the Appellate Court to itself: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . . [T]he Supreme Court may transfer a cause or class of causes from itself . . . to the Appellate Court. The court to which a cause is transferred has jurisdiction." See *State* v. *Skipwith*, supra, 326 Conn. 515 n.3 (including writ of error as cause that may be transferred from Supreme Court to Appellate Court under § 51-199 [c]); *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 24 n.5, 204 A.3d 71 (2019) (same). This plain and unambiguous language makes clear that subsection (c) expands the jurisdiction of the Appellate Court; it does not limit the jurisdiction of the Supreme Court.

Specifically, subsection (b) of § 51-199 requires that writs of error be brought directly to the Supreme Court, and, thus, the Appellate Court normally lacks jurisdiction over them. Subsection (c) of § 51-199, however, extends the Appellate Court's jurisdiction to hear and decide writs of error if the Supreme Court has transferred a writ of error to the Appellate Court. But even though the plain language of subsection (c) expressly expands the jurisdiction of the Appellate Court to include writs of error upon transfer, no language expressly divests this court of the "final jurisdiction" over writs of error that subsection (a) of § 51-199 confers. See *Callaghan* v. *Car Parts International, LLC*, supra, 329 Conn. 571 (we must interpret text of statute itself in context of its relationship to other statutes); see also *Fedus* v. *Planning & Zoning Commission*, 278 Conn. 751, 778–79, 900 A.2d 1 (2006) (to extent that statute limits or deprives court of jurisdiction, legislature's intent to do so must be explicitly expressed). "[I]n the absence of any constitutional provision or statute depriving this court of its common-law jurisdiction over writs of error, this court has jurisdiction . . . ." *State* v. *Skipwith*, supra, 326 Conn. 521.[3] Nothing in subsection (c) remotely suggests that by transferring a writ of error to the Appellate Court, this court loses its authority to make the final determination over that writ of error.[4]

Although it is clear that § 51-199 does not divest this court of final jurisdiction over transferred writs of error, the means by which a plaintiff in error or a defendant in error may seek review of the Appellate Court's judgment on a transferred writ of error is perhaps less clear. Section 51-199 itself provides no guidance.

Section 51-197f, however, governs petitions for certification to appeal: "Upon final determination of *any appeal* by the Appellate Court, there shall be no right to further review except the Supreme Court shall have the power to certify cases for its review upon petition by an aggrieved party or by the appellate panel which heard the matter." (Emphasis added.) Our General Statutes do not define the term "appeal." Turning to the dictionary definition of the term, we observe that "appeal" is defined broadly. See, e.g., Black's Law Dictionary (10th Ed. 2014) p. 117 (defining "appeal" as "[a] proceeding undertaken to have a decision reconsidered by a higher authority; esp., the submission of a lower court's or agency's decision to a higher court for review and possible reversal"); see also Ballentine's Law Dictionary (3d Ed. 1969) p. 82 (defining appeal as "[a]ny form of appellate review other than by one of the extraordinary writs").[5] This broad definition is not precise as to whether it includes writs of error. It is plausible, however, for this broad definition of the term "appeal," comprising any form of appellate review, to include writs of error, which clearly constitute a form of appellate review and are defined similarly as an appeal. See Ballentine's Law Dictionary, supra, p. 1380 (defining "writ of error" as "[a] commission by which the judges of one court are authorized to examine a record on which a judgment was given in another court, and affirm or reverse that judgment according to law"); see also *Chipman* v. *Waterbury*, 59 Conn. 496, 497, 22 A. 289 (1890) (same).

Additionally, although our rules of practice may use the term "appeal" to refer to appeals by parties from final judgments; see Practice Book § 61-1; when previously interpreting the scope of the term "appeal" in relation to § 51-197f, we have construed the term broadly and have held that this court may grant certification to appeal pursuant to § 51-197f to challenge orders for which appellate review would be "tantamount" to an appeal. See *In re Judicial Inquiry No. 2005-02*, 293 Conn. 247, 258, 977 A.2d 166 (2009). Thus, in light of the commonly approved usage of the term "appeal" and prior cases interpreting § 51-197f, the term "appeal" for purposes of § 51-197f clearly and unambiguously is broadly defined to encompass any review of a lower court's decision by a higher court that is "tantamount" to an appeal brought by a party from a final judgment. To determine whether a proceeding is tantamount to an appeal, this court has focused on whether the legislature intended this court or another court to be the court of last resort.

For example, in *In re Judicial Inquiry No. 2005-02*, supra, 293 Conn. 258–59, this court held that a petition for review of a three judge panel determination regarding statutory authorization to disclose the state's application for a grand jury investigation under General

Statutes § 54-47g was "tantamount to an 'appeal' within the meaning of § 51-197f." In reaching this holding, we recognized that the language of § 54-47g (a) contemplated an appeal from such a panel's ruling: " '[a]ny person aggrieved by an order of the panel shall have the right to appeal such order by filing a petition for review with the Appellate Court . . . .' " (Emphasis omitted.) Id., 259, quoting General Statutes § 54-47g (a). Although a petition for review perhaps does not fall under a narrow definition of the term "appeal," we concluded that the language in § 54-47g was "a strong indication that the legislature did not intend for the Appellate Court to be the court of last resort with respect to the review of grand jury panel orders." *In re Judicial Inquiry No. 2005-02*, supra, 259.

Analogously, although § 51-199 does not use the term "appeal" in relation to the mechanism by which this court may review the Appellate Court's judgment on a writ of error, a writ of error also is "tantamount to an appeal" for two reasons. First, like § 54-47g in *In re Judicial Inquiry No. 2005-02*, the language used in § 51-199 provides a strong indication that the legislature did not intend for the Appellate Court to be the court of last resort with respect to the review of trial court orders that give rise to writs of error. As discussed previously, although the Supreme Court may transfer writs of error to the Appellate Court, § 51-199 (a) specifically confers on the Supreme Court final and conclusive jurisdiction over writs of error. Nothing in subsection (c) of § 51-199 suggests that the legislature intended for the Supreme Court to lose this authority upon transferring a writ of error. Rather, we read the statutes as more logically manifesting a legislative intent for the Supreme Court to be the court of last resort in these matters. Thus, as this court is the court of last resort in this state, it would be an illogical and bizarre result if the transfer of a writ of error to the Appellate Court divested this court of final jurisdiction in the absence of an express intent by the legislature to do so. See *Raftopol* v. *Ramey*, 299 Conn. 681, 703, 12 A.3d 783 (2011) ("it is axiomatic that those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results" [internal quotation marks omitted]).[6]

Second, writs of error and appeals share many features in common. The writ of error was the predecessor to the appeal and, in many ways, was the first form of appeal: "Prior to the enactment of the appeals statute in 1882, chapter 50 of the 1882 Public Acts, there were no appeals as of right in this state. . . . The writ of error is the common-law method, and formerly the only method in this [s]tate, of carrying up a cause from an inferior to a higher court for the revision of questions of law." (Citations omitted; internal quotation marks omitted.) *Haylett* v. *Commission on Human Rights & Opportunities*, 207 Conn. 547, 550, 541 A.2d 494 (1988).

"The appeal . . . simply performs the office of the old . . . writ of error . . . ." *Schlesinger* v. *Chapman*, 52 Conn. 271, 274 (1885). A writ of error is, thus, "the functional equivalent of an ordinary appeal." *Simms* v. *Warden*, 229 Conn. 178, 184, 640 A.2d 601 (1994).

It is true that appeals and writs of error are procedurally distinct in how they are filed. Compare Practice Book §§ 63-1 and 63-3 with Practice Book §§ 72-1 through 72-4. Like appeals, however, writs of error must be taken from final judgments; Practice Book § 72-1 (a); and must conform to the rules of practice for appeals. See Practice Book § 72-4. After they have been filed, writs of error are therefore prosecuted, briefed, and argued in the same manner as appeals.

A primary distinction between appeals and writs of error is that writs of error fill a gap left by appeals by allowing nonparties aggrieved by a final judgment to obtain review. See *Bergeron* v. *Mackler*, 225 Conn. 391, 391–92 n.1, 623 A.2d 489 (1993) (noting aggrieved nonparty cannot appeal under General Statutes § 52-263 but must instead file writ of error to obtain review of final judgment); see also General Statutes § 52-263 (only party aggrieved by final judgment of Superior Court may appeal). Rather than setting writs of error apart from appeals, however, this distinction confirms their resemblance. A writ of error is the means by which a nonparty may seek review of a final judgment. An appeal is the means by which a party may seek review of a final judgment. There is no distinction between a writ of error and an appeal that justifies treating them differently for purposes of § 51-197f.

We therefore conclude that the Appellate Court's judgment on a transferred writ of error is tantamount to an appeal for purposes of § 51-197f. Accordingly, this court has jurisdiction to grant certification to appeal from the Appellate Court's judgment on Salinas' transferred writ of error.

## II

Having determined that this court has jurisdiction to grant certification to appeal from the Appellate Court's judgment on a transferred writ of error, we turn to whether, nevertheless, the Appellate Court lacked subject matter jurisdiction due to a lack of an appealable final judgment. We conclude that there was no final judgment, and, thus, the writ of error must be dismissed for lack of subject matter jurisdiction.

The town argues that the Appellate Court did not have subject matter jurisdiction over Salinas' writ of error because the trial court's interlocutory discovery order was not an appealable final judgment and did not satisfy either prong of the test set forth in *State* v. *Curcio*, supra, 191 Conn. 31,[7] for obtaining appellate review. See Practice Book § 72-1 (a) ("[w]rits of error for errors in matters of law only may be brought from

a final judgment of the Superior Court to the Supreme Court"). Specifically, it argues that the trial court's denial of Salinas' motion for a protective order did not terminate a separate and distinct proceeding because the information sought will directly impact and is pertinent to the trial court's ability to resolve the underlying case. Additionally, relying on this court's decision in *Niro* v. *Niro*, 314 Conn. 62, 67–68, 100 A.3d 801 (2014), the town contends that there would be no irreparable harm to Salinas because he will be able to appeal from the trial court's order if he chooses to stand in contempt for violating it. Finally, the town argues that no public policy concerns in this case justify permitting Salinas to appeal from an interlocutory discovery order.

In response, Salinas argues that there was an appealable final judgment because the denial of his motion for a protective order terminated a separate and distinct proceeding. Specifically, he argues that (1) there was a clear and definite discovery order that constituted a final and comprehensive ruling from which there can be no further proceedings before the trial court that affect him,[8] and (2) he is a nonparty who is not involved in the underlying lawsuit in any way. He further argues that the discovery order is not related to or intertwined with the underlying case because the trial court does not require the information sought to resolve the underlying case. In particular, he argues that his appraisal reports pertain to the value of the property in 2010 and 2011, whereas the underlying case centers on the value of the property in 2012. We disagree with Salinas that the trial court's ruling was immediately appealable.

The following additional facts are relevant to the resolution of this issue. During the course of pretrial discovery, the town obtained two appraisal reports commissioned by the bank and authored by Salinas containing his opinions regarding the value of the property as of October 6, 2010, and July 12, 2011. Because the expert appraisal report independently obtained by Redding Life contained property values drastically lower than the property values listed in Salinas' reports, the town sought to depose Salinas to understand the difference in values. The town filed a motion for a commission to take an out-of-state deposition of Salinas. In that motion, the town listed Salinas' qualifications as an appraiser, stated that he had appraised the property in 2010 and 2011 at values substantially in excess of the value stated by the town's assessor, and sought "to depose . . . Salinas with respect to his determination of [the] value[s] in these appraisals."

Although the trial court granted the motion over Salinas' objection, no deposition ever has taken place. There is therefore no record of what questions the town and Redding Life would have asked Salinas. Although it can be surmised from the town's motion for a commission that the town would have asked Salinas about the

opinions contained in his reports, we do not know what specific questions would be posed; nor do we know what questions Redding Life, which also would be present at and participating in the deposition, would ask Salinas—questions regarding his preexisting opinions, questions regarding new opinions, or merely questions of fact as a fact based witness who had viewed the property in 2010 and 2011.[9]

With this factual context in mind, we turn to the legal principles that guide our analysis. "Practice Book § 72-1 (a) provides: 'Writs of error for errors in matters of law only may be brought from *a final judgment of the* [S]*uperior* [C]*ourt* to the [S]upreme [C]ourt in the following cases: (1) a decision binding on an aggrieved nonparty . . . and (4) as otherwise necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law.' . . . The lack of a final judgment deprives this court of subject matter jurisdiction over a writ of error." (Emphasis in original.) *McConnell* v. *McConnell*, 316 Conn. 504, 510, 113 A.3d 64 (2015). Generally, "an order issued upon a motion for discovery ordinarily is not appealable because it does not constitute a final judgment, at least in civil actions." *Abreu* v. *Leone*, 291 Conn. 332, 344, 968 A.2d 385 (2009). Typically, a nonparty must be found in contempt of a discovery order before it may appeal that ruling. See id., 346–47.

Nevertheless, appellate courts "may deem interlocutory orders or rulings," including discovery rulings, "to have the attributes of a final judgment if they fit within either of the two prongs of the test set forth in *State* v. *Curcio*, [supra, 191 Conn. 31]. . . . Under *Curcio* . . . interlocutory orders are immediately appealable if the order or ruling (1) terminates a separate and distinct proceeding or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *Niro* v. *Niro*, supra, 314 Conn. 67–68.

In the present case, it is undisputed that the trial court's order denying Salinas' motion for a protective order was an interlocutory ruling that normally is not appealable. Accordingly, the Appellate Court had jurisdiction only if the order satisfies the first or second prong of *Curcio*. It satisfies neither.

A

Our case law regarding whether a discovery order may constitute an appealable final judgment under the first prong of *Curcio* has undergone considerable change in the last decade, which has created some confusion.[10] In *Abreu* v. *Leone*, supra, 291 Conn. 334, the defendant, a minor child, filed a claim with the Claims Commissioner seeking permission to bring an action against the Department of Children and Families (department) for personal injuries inflicted by Geo-

vanny M., the foster child of the plaintiff, Joseph Abreu. As part of that underlying action, to which Abreu was not a party, a notice of deposition and subpoena duces tecum were issued to Abreu. Id., 334–35. Abreu then filed an independent action seeking a protective order on the ground that, pursuant to General Statutes § 17a-28, he was prohibited from disclosing information about a foster child. Id., 335. The trial court allowed the deposition to go forward on the ground that the precise questions the parties would pose were unknown, and, thus, it was not clear if the defendant might seek other information that was not protected by § 17a-28. Id. At the deposition, when the parties disagreed about the scope of the trial court's order, counsel placed all disputed questions on the record and then sought clarification from the court. Id., 336. The trial court ordered that certain specific questions be answered. Id., 337. The department appealed from that order. Id., 337–38.

In determining whether there was a final judgment, this court in *Abreu* determined that the discovery order at issue fell within the first prong of *Curcio* because a separate and distinct proceeding had terminated. Id., 344–45. The reasoning for this holding was twofold. First, this court explained that "there are no further proceedings before the Superior Court involving [Abreu] because the questions have been propounded and the trial court unequivocally has ruled what must occur—certain identified questions must be answered. . . . [I]t is known whether [Abreu] will refuse to answer the contested questions put to him by the defendant, and it is known whether the trial court will uphold the 'privilege' as to the questions." (Citation omitted; emphasis omitted.) Id., 345–46. Although Abreu could later be held in contempt and then appeal, "[b]ecause . . . the specific questions have been propounded and the trial court has ruled unequivocally what must occur, we can only regard the posture of the . . . case as the functional equivalent of that situation." Id., 347.

Second, this court explained that "although the appellate final judgment rule is based partly on the policy against piecemeal appeals and the conservation of judicial resources . . . there is a counterbalancing factor in this situation." (Citation omitted; internal quotation marks omitted.) Id. Specifically, "[r]equiring the postponement of an appeal of the order until [Abreu] . . . is forced to choose between being found in contempt for his good faith attempt to comply with § 17a-28 (b) and violating that statute, thereby subjecting himself to criminal sanctions, would discourage participation by otherwise willing foster parents and thus undermine the goals of that system. Either option also puts the foster child in jeopardy." Id., 348.

This court has since explained that our holding in *Abreu* established three guiding principles: "First, the court's focus in determining whether there is a final

judgment [under the first prong of *Curcio*] is on the order immediately appealed, not [on] the underlying action that prompted the discovery dispute. . . . Second, determining whether an otherwise nonappealable discovery order may be appealed is a fact specific inquiry, and the court should treat each appeal accordingly. . . . Third, although the appellate final judgment rule is based partly on the policy against piecemeal appeals and the conservation of judicial resources . . . there [may be] a counterbalancing factor that militates against requiring a party to be held in contempt in order to bring an appeal from a discovery order." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Woodbury Knoll, LLC* v. *Shipman & Goodwin, LLP*, 305 Conn. 750, 760–61, 48 A.3d 16 (2012).

Subsequently, and with these guiding principles in mind, this court in *Woodbury Knoll, LLC*, was faced with whether the denial of a motion to quash a subpoena duces tecum was an appealable final judgment. Id., 752–53. The defendants in error, who were the defendants in an underlying legal malpractice action, sought materials allegedly protected by the attorney-client privilege and work product doctrine from the plaintiff in error, a law firm that was a nonparty to the underlying action. Id. The trial court denied the motion to quash and later issued a thorough articulation as to which documents were discoverable and why, from which the plaintiff in error appealed. Id., 754–55. This court held that the discovery order satisfied the first prong of *Curcio*. Id., 757.

However, this court's reasoning in *Woodbury Knoll, LLC*, differed somewhat from its reasoning in *Abreu*. As in *Abreu*, the court held that the discovery order terminated a separate and distinct proceeding because there was "a clear and definite discovery order," where the specific "questions have been propounded and the trial court has unequivocally ruled . . . ." (Internal quotation marks omitted.) Id., 761. Unlike *Abreu*, the court also emphasized that the plaintiff in error was not a party to the underlying action. Id. For these two reasons "alone," the court in *Woodbury Knoll, LLC*, held that the first prong of *Curcio* was satisfied. Id., 762.[11]

Nonetheless, the court in *Woodbury Knoll, LLC*, went on to hold that "there [also were] compelling policy reasons not to require [the plaintiff in error] to be subjected to a contempt ruling in order for it to obtain appellate review of the discovery order"; id.; because it would be unjust "to apply our final judgment jurisprudence in a manner that requires a nonparty attorney, in his or her role as an officer of the court, to disobey a court order as the sole means of raising a good faith challenge to a discovery order in order to satisfy his or her professional obligation to the client." Id., 766. In a footnote, the court noted that "policy concerns are not a factor under either prong of *Curcio*, and, accord-

ingly, it would be inappropriate to rely on policy *alone* to justify allowing an appeal under *Curcio*." (Emphasis added.) Id., 762 n.10.

Even more recently, this court has clarified its holdings in *Abreu* and *Woodbury Knoll, LLC*. In *Niro* v. *Niro*, supra, 314 Conn. 62, the trial court in a marriage dissolution case ordered nonparties, the family members and business partners of the defendant, to produce specific business and personal financial records that were essential for the court to determine the state of the defendant's finances and to distribute equitably the marital assets. Id., 65–66. This court held that the trial court's order was not a final judgment under either prong of *Curcio*. Id., 67. In determining that the first prong was not satisfied, this court summarized the holding of *Woodbury Knoll, LLC*, as relying on the fact that there was a clear, definite, final and comprehensive order, and that the plaintiff was a nonparty not involved in the underlying lawsuit in any way. We explained in *Niro* that although the discovery order was directed at a nonparty, it was "intertwined with the underlying dissolution proceeding because the information subject to disclosure will contribute to the trial court's knowledge of [the defendant's] assets and its ability to perform its statutory duty of equitably distributing the marital estate." Id., 72. Thus, this court shifted its focus from whether the nonparty was involved in the underlying action, an important consideration in *Woodbury Knoll, LLC*, to whether the information possessed by the nonparty was involved or intertwined with the underlying action.

This court therefore explained in *McConnell* v. *McConnell*, supra, 316 Conn. 504, that, in *Niro*, it had clarified its holding in *Woodbury Knoll, LLC*: "We have recently clarified . . . that the relevant discovery order [in *Woodbury Knoll, LLC*] was a final judgment under the first prong of *Curcio* and, therefore, could be challenged by way of a writ of error . . . not based solely on the fact that [the plaintiff in error] was a nonparty to the underlying action, but . . . also based on the fact that the discovery order . . . was not intertwined with the underlying proceeding. . . . [A] discovery order directed at a nonparty does not arise from a separate and distinct proceeding, but is intertwined with the underlying action when the information sought in the order is required by the finder of fact to resolve the issues raised in that action." (Citation omitted; internal quotation marks omitted.) Id., 512. In *McConnell*, this court held that the first prong of *Curcio* was not satisfied because the trial court's discovery order sought information that was not available any other way, as all other witnesses had invoked their fifth amendment right not to testify, and the order was directed at materials that were required by the trial court to resolve the issues that had been raised in the underlying probate appeal. Id., 512–13. Thus, the discov-

ery order was inextricably intertwined with the underlying probate proceeding, to which the plaintiffs in error were not parties. Id., 513. Because the information was required by the fact finder to resolve the issues raised in the underlying case, the court ruled that there was no final judgment. Id.

In sum, in light of *Abreu*, *Woodbury Knoll, LLC*, *Niro* and *McConnell*, an interlocutory discovery order is an appealable final judgment under the first prong of *Curcio* only if the trial court has issued a clear and unequivocal order that is sufficiently definite, specific, and comprehensive concerning a discovery request served on a nonparty for information that is not required to resolve the underlying issue. In the present case, the order at issue does not satisfy the first prong of *Curcio* because there was no clear and unequivocal trial court order. Specifically, the trial court's discovery order was not sufficiently definite, specific, or comprehensive.

Unlike in *Abreu*, *Woodbury Knoll*, *LLC*, and *Niro*, in which the trial court ruled on the specific questions and documents at issue, in the present case, the specific questions that the parties would pose to Salinas are unknown. Although the town has stated that its primary purpose for deposing Salinas is to authenticate his reports, it also has conceded on numerous occasions that its questions would pertain to a broader subject matter—his reports in general and his opinions as to the value of the property more specifically. Redding Life has not stated on the record the nature or specifics of its potential questions. And Salinas has refused to testify at all, asserting that he has an absolute privilege from testifying. Although the court's articulation of its order specifically stated that Salinas could be deposed as to preexisting opinions, nothing in its order limits the questioning to this topic. Without knowing the precise questions that will be asked at the deposition, this court cannot determine whether any privilege, if one even exists, applies.

Even if we assume that Salinas has an absolute privilege not to testify regarding his unretained expert opinions, without speculating, we cannot determine on this record whether this privilege applies to all questions that may be asked at the deposition. No privilege exists that would prohibit the town from deposing Salinas altogether, and Salinas does not argue for such an expansive privilege. For example, even an absolute privilege would not prevent the town and Redding Life from deposing Salinas as a fact witness or as a keeper of records to establish the admissibility of his reports as business records. See Conn. Code Evid. § 8-4. Although the town represented that it sought to depose Salinas about the value of the property as stated in his reports, some of its (or Redding Life's) questions may be purely fact based, concerning, for example, what the property looked like when Salinas viewed it. Such information

may be used to justify a change in property value if the property has been altered since the time of Salinas' reports, without requiring Salinas to give an expert opinion.

Because the record does not contain the questions that would be posed to Salinas, it is unclear which, if any, questions would be privileged. There is no reason the parties—including Redding Life, which has not participated in this appeal—could not have done as the parties in *Abreu* did: attend a deposition and make a record of the specific questions that seek allegedly privileged information, and then request a further ruling from the trial court on particular questions. Instead, without such a record, Salinas essentially seeks an advisory opinion, requesting a decision regarding the existence of an unretained expert privilege in the event that privileged questions are posed to him at the deposition. We are not prepared to issue such an advisory opinion recognizing a new privilege for expert witnesses on this record. See, e.g., *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419–20, 880 A.2d 882 (2005) ("[W]e have consistently held that we do not render advisory opinions. . . . [W]here the question presented is purely academic, we must refuse to entertain the appeal." [Internal quotation marks omitted.]); *McDonnell* v. *Maher*, 3 Conn. App. 336, 339, 488 A.2d 461 (1985) ("[w]ithout an actual controversy, the case is a hypothetical tempest in an appellate teapot"). The requirement of a definite and comprehensive order under the first prong of *Curcio* is not merely a technical rule but, rather, enables this court to see the whole picture when reviewing an interlocutory order. In the absence of specificity, we are left in the dark, attempting to determine the scope of an exception, assuming one exists, when such an exception may not even apply to the case at hand.

Salinas responds that the present discovery order is analogous to, not distinguishable from, the discovery order in *Abreu* because no further proceedings involve him, as he cannot be held in contempt in Connecticut, and, thus, the discovery order terminated a separate and distinct proceeding. Although it is true that, in *Abreu*, this court noted that under the first prong of *Curcio*, further proceedings would not involve Abreu because the proceedings were the equivalent of contempt proceedings; *Abreu* v. *Leone*, 291 Conn. 347; it is clear from the evolution of our case law that, as applied to discovery orders, the first prong does not focus on whether further proceedings involve the nonparty deponent, but on whether further proceedings require the information possessed by the nonparty. See *McConnell* v. *McConnell*, supra, 316 Conn. 512; *Niro* v. *Niro*, supra, 314 Conn. 72. However, because we determine that there was no clear and unequivocal order, we need not determine whether the information at issue was required by the trial court to resolve the

issues raised in the underlying action, as both are required to satisfy the first prong of *Curcio*. To the extent that Salinas is arguing that further proceedings do not and cannot affect him, such an argument is more appropriately considered under the second prong of *Curcio*. See part II B of this opinion (focusing specifically on whether Salinas' rights can be vindicated in the future through further proceedings); see also *Niro* v. *Niro*, supra, 67–69.

Accordingly, the discovery order at issue did not terminate a separate and distinct proceeding under the first prong of *Curcio* because there was no clear and unequivocal order.

B

Alternatively, Salinas contends that the discovery order was an appealable final judgment because no further proceedings before the trial court can affect him. This argument, if convincing, would permit him to bring a writ of error under the second prong of *Curcio*. We agree with the town, however, that there are further proceedings that could affect him. Specifically, Salinas may be held in contempt by the trial court for failing to comply with the discovery order, which then would constitute an appealable final judgment. See *Niro* v. *Niro*, supra, 314 Conn. 73 (nonparty may appeal from discovery order in future if held in contempt for violation of order).

Salinas argues that he could not be held in contempt by a Connecticut court because the subpoena was served on him in Florida for a deposition in Florida, and, thus, any action to enforce the subpoena or hold him in contempt for not complying with it would need to be brought in a Florida court. This argument fails to bring him within *Curcio*'s second prong for a variety of reasons.

First, it may be true that a Florida court would have been an appropriate place for Salinas to seek a protective order and for the town to initiate contempt proceedings. See Practice Book § 13-28 (e) and (f); see also *Cassinelli Bros. Construction Co.* v. *Gray*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-95-0142662-S (May 9, 1996) (16 Conn. L. Rptr. 629, 629) ("[a]lthough this court can issue a commission to take an out-of-state deposition . . . the New York court will have to issue a subpoena to compel attendance . . . [and] make any appropriate order in aid of taking such deposition" [internal quotation marks omitted]). Salinas, however, did not seek a protective order in Florida. Rather, he requested such an order from the Connecticut Superior Court. We presume that, having invoked the jurisdiction of the Connecticut court system, Salinas will comply with Connecticut's resolution of his challenge to the subpoena. If Salinas never had filed a motion for a protective order in the Connecti-

cut Superior Court, the Connecticut courts most likely would not be able to hold Salinas in contempt for failing to comply with the subpoena. Because Salinas sought relief from the Connecticut court system, however, the trial court may enforce the resulting order, and Salinas may be held in contempt for violating it. See, e.g., *Noll* v. *Hartford Roman Catholic Diocesan Corp.*, Docket No. CV-02-4034702-S, 2008 WL 4635591, *7 (Conn. Super. September 26, 2008) ("This court has jurisdiction over the parties to enforce its orders and to compel parties to obey its rules. . . . [The defendant witness, who resided in Virginia] did not avail himself of the opportunity to seek a protective order in Virginia [but rather sought one in Connecticut].").[12]

After the trial court declined to issue the protective order, Salinas sought review from this court and our Appellate Court. We are willing to provide that review so long as he appeals from a final judgment under our law. Salinas, however, wants to have his cake and to eat it, too. He seeks review from this court to obtain a protective order but also argues that the Connecticut courts have no power over him for purposes of contempt.

Second, although it is true that a Connecticut court could not enforce the subpoena at issue as a contempt sanction because it was issued by an out-of-state-authority to an out-of-state witness; see *Struckman* v. *Burns*, 205 Conn. 542, 552, 534 A.2d 888 (1987) ("the defendant does not have the power by subpoena to force an out-of-state witness to travel to Connecticut for trial"); that does not mean the court cannot hold Salinas in contempt for violating a discovery order that was the byproduct of his having sought aid from the Connecticut court system. See Practice Book § 1-13A (a) ("[a]ny person . . . misbehaving or disobeying any order of a judicial authority in the course of any judicial proceeding may be adjudicated in contempt and appropriately punished"). The court's power to impose sanctions for contempt is not limited to forcing a witness to testify. See *Wehrhane* v. *Peyton*, 134 Conn. 486, 496, 58 A.2d 698 (1948) (explaining that although certain orders, such as injunctions, may not be enforced against nonresidents, there are other "means of punishing a violator and that is to deny him any aid from courts of the state . . . until he has purged himself of the contempt"); see also *Evans* v. *General Motors Corp.*, 277 Conn. 496, 523, 893 A.2d 371 (2006) (court has discretion to determine which sanctions to impose for contempt); Practice Book § 1-21A (sanctions for civil contempt may include fines). Even if sanctions will be of no use or are unenforceable in Connecticut, a party is not prevented from moving for a finding of contempt. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 240–41, 905 A.2d 1165 (2006) (explaining that even if sanctions are not useful, party may still move for finding of contempt). Moreover, the question of enforcement of a Connecticut

order of contempt is not at issue for present purposes; the only issue is whether further proceedings could affect Salinas, and the answer to that question is yes, because contempt proceedings may be initiated against him.

Third, the case on which Salinas relies to establish that he cannot be held in contempt by a Connecticut court, *Lougee* v. *Grinnell*, 216 Conn. 483, 486–87, 582 A.2d 456 (1990), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999), is distinguishable. In *Lougee*, the underlying civil action was pending in Texas. Id., 484–85. The plaintiff in that underlying case applied to the Superior Court in Connecticut for a subpoena to force Virginius B. Lougee, a nonparty who lived in Connecticut, to appear at a deposition in Connecticut. Id., 485–86. Lougee moved to quash the subpoena and for a protective order in Connecticut Superior Court. Id., 486. The trial court denied Lougee's motion. Id. Lougee appealed, and this court held that there was an appealable final judgment under the first prong of *Curcio* because "the sole judicial proceeding instituted in Connecticut concerned the propriety of [the] deposition subpoena, a proceeding that will not result in a later judgment from which [Lougee could] then appeal." (Internal quotation marks omitted.) Id., 487.

Thus, *Lougee* did not involve, as the present case does, whether a nonresident, nonparty may be held in contempt for violating a discovery order for purposes of the second prong of *Curcio*. Rather, *Lougee* involved a discovery order that was the only portion of the underlying case pending in a Connecticut court. This court made no suggestion in *Lougee* that the reason why further proceedings would not affect Lougee was because the trial court was incapable of holding him in contempt. Rather, the focus of our decision in *Lougee* was that, because the discovery order was the sole judicial proceeding instituted in Connecticut, the trial court's ruling terminated a separate and distinct proceeding under *Curcio*'s first prong. Id. Unlike the situation in *Lougee*, the discovery order in the present case is not the sole judicial proceeding instituted in Connecticut. Rather, the discovery order at issue is part of an underlying civil action instituted in Connecticut. Additionally, as explained in part II A of this opinion, the discovery order in the present case did not terminate a separate and distinct proceeding because it was not a clear and definite order, which distinguishes it from the discovery order in *Lougee*.

Finally, requiring Salinas to appeal from an order of contempt does not raise an important counterbalancing public policy in favor of permitting an interlocutory appeal. Such a result does not violate justice or public policy in the same way as requiring the foster parent in *Abreu* or the nonparty law firm in *Woodbury Knoll*,

*LLC*, to choose between contempt and violating a law or ethical code. In the absence of an overriding, important public policy consideration, requiring Salinas to appeal from a finding of contempt ensures that there is an actual live controversy in which Salinas' legally protected interest has been adversely affected. See *Slimp* v. *Dept. of Liquor Control*, 239 Conn. 599, 609, 687 A.2d 123 (1996) ("courts and parties [should not be] vexed by suits brought to vindicate nonjusticiable interests and . . . judicial decisions which may affect the rights of others [should be] forged in hot controversy, with each view fairly and vigorously represented" [internal quotation marks omitted]). Once Salinas attends the deposition, objects on the record to specific questions, and a trial court decides which, if any, questions he must answer, the courts will be better positioned to determine not only whether an unretained expert privilege exists, but if such a privilege even applies in this case. As the record now stands, Salinas is requesting this court to decide this issue in a vacuum.

Accordingly, the discovery order does not satisfy either prong of *Curcio* and thus does not constitute an appealable final judgment. Therefore, Salinas' writ of error must be dismissed for lack of subject matter jurisdiction.[13]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to dismiss the writ of error for lack of subject matter jurisdiction.

In this opinion the other justices concurred.

[1] Because the writ of error should have been dismissed for lack of a final judgment, we do not reach and are not prepared to recognize whether a qualified unretained expert privilege exists. See part II A of this opinion.

[2] Salinas suggests that this court may review the Appellate Court's decision on a transferred writ of error only if a party files a motion for reconsideration with the Appellate Court in tandem with a motion to transfer to this court, or by seeking certification to file a public interest appeal under General Statutes § 52-265a.

[3] Because we determine that in enacting subsection (c) of § 51-199, the legislature did not intend to limit this court's final jurisdiction over writs of error, "[w]e express no opinion here as to whether such a statute would pass muster under the state constitution." *State* v. *Skipwith*, supra, 326 Conn. 521 n.11.

[4] To the extent that § 51-199 is ambiguous, the legislative history of subsection (c) makes clear that the legislature did not intend to divest this court of final jurisdiction over writs of error. The public act that created subsection (c) was also the act by which the legislature implemented the constitutional amendment creating the then new Appellate Court. See Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (Spec. Sess. P.A. 83-29). During the legislative hearings on Spec. Sess. P.A. 83-29, it was made clear that the purpose for creating the Appellate Court was to lessen the burden of the Supreme Court's caseload, but that the Supreme Court retained jurisdiction to exercise discretion to decide which matters to hear. See 26 S. Proc., Pt. 16, 1983 Spec. Sess., p. 796, remarks of Senator Howard T. Owens, Jr. ("The State Supreme Court will retain jurisdiction in [c]lass A felonies, review the death sentences, election or primary disputes, matters involving substantial public interest and reprimands or censure of judges and [over] areas that they should reserve exclusive jurisdiction. In other matters, the matters will go to the Appellate Court or the Supreme Court who will exercise jurisdiction to keep them."); 26 H.R. Proc., Pt. 31, 1983 Spec. Sess., p. 267, remarks of Representative Richard D. Tulisano ("[the bill] also would enable and allow us to loosen up the backlog in the Supreme Court giving [it] an opportunity

to address issues of statewide importance and develop statewide . . . interpretations of the law in giving detailed and deep analysis to those cases which are of importance to the general public").

[5] A writ of error is not an extraordinary writ. See Black's Law Dictionary, supra, p. 1845 (An "extraordinary writ" is defined as "[a] writ issued by a court exercising unusual or discretionary powers. Examples are certiorari, habeas corpus, mandamus, and prohibition."); *Ex parte Harding*, 219 U.S. 363, 376, 31 S. Ct. 324, 55 L. Ed. 252 (1911) (establishing that writs of error are different from extraordinary writs by holding that extraordinary writs were not available where appeal or writ of error would lie); 33 A.L.R.3d 448, 462 n.3, § 1 [a] (1970) (defining "appealability" as "the aptness or fitness of a case for review by ordinary appellate procedures, including appeal and writ of error but not including extraordinary writs such as certiorari, habeas corpus, mandamus and prohibition"); see also *Clark* v. *Ewing*, 196 S.W.2d 53, 55 (Tex. Civ. App. 1946) ("Neither the writ of prohibition nor any other extraordinary writ will be granted where there is an adequate remedy provided by law, such as an appeal or writ of error. Where these ordinary remedies are complete and adequate, it is consistently held that the extraordinary jurisdiction of an appellate court cannot be invoked.").

[6] Notably, this court previously has granted certification to appeal from judgments of the Appellate Court on transferred writs of error pursuant to § 51-197f. See *State* v. *Skipwith*, supra, 326 Conn. 516; *Daniels* v. *Alander*, 268 Conn. 320, 321–22, 844 A.2d 182 (2004). The cases Salinas cites in support of his argument that a writ of error is not an appeal for purposes of § 51-197f are distinguishable in that they either do not involve a writ of error or another kind of order tantamount to an appeal; see *State* v. *Ayala*, 222 Conn. 331, 338–41, 610 A.2d 1162 (1992); or the statute governing the order at issue did not intend for the Supreme Court to be the court of last resort in that matter. See *Grieco* v. *Zoning Commission*, 226 Conn. 230, 231–33, 627 A.2d 432 (1993).

[7] Under *State* v. *Curcio*, supra, 191 Conn. 31, an interlocutory order or ruling may be immediately appealable if the order or ruling "(1) terminates a separate and distinct proceeding or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *Niro* v. *Niro*, 314 Conn. 62, 68, 100 A.3d 801 (2014).

[8] Salinas argues only that there is a final judgment under the first prong of *Curcio*, i.e., that the discovery order terminated a separate and distinct proceeding. His arguments, however, combine and implicate both prongs of *Curcio*. Accordingly, to the extent possible, we have separated his arguments between the two prongs as appropriate.

[9] At a hearing before the trial court on the bank's objection to the town's notice of deposition, the town represented that at the deposition, it intended to have Salinas authenticate his reports and, beyond that, would ask questions concerning the reports and the property's market value, although counsel was not certain of the specific questions he would pose because he had not yet prepared for the deposition. Although both the town and Redding Life represented that Redding Life would cross-examine Salinas at the deposition, Redding Life could not specify the questions it intended to ask. It was after this hearing that the trial court ordered the deposition to proceed.

Similarly, at oral argument before this court, although counsel for the town stated that the town's primary purpose for deposing Salinas was to authenticate and provide a foundation for his reports, counsel also stated that the town wanted Salinas to answer any questions the parties had about the reports and to be available for cross-examination by Redding Life. Counsel for the town did not state on the record what specific questions he would ask Salinas but did explain that the town had questions regarding foundation, methodology, and the market value of the property. He conceded that Redding Life might pose questions that would challenge Salinas' opinions and go beyond questions necessary to authenticate the reports.

[10] The lack of clarity in our case law might explain the Appellate Court's understandable reluctance to grant the town's motion to dismiss Salinas' writ of error. Salinas notes that no party has sought review of that decision. This court, however, may raise the issue of subject matter jurisdiction at any time sua sponte. E.g., *Peters* v. *Dept. of Social Services*, 273 Conn. 434, 441, 870 A.2d 448 (2005) ("subject matter jurisdiction . . . may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal").

[11] Although the plaintiff in error in *Abreu* also was a nonparty, this court's analysis in that case did not center on that fact.

[12] Salinas' argument appears to implicate the court's personal jurisdiction over him. He has not, however, disputed personal jurisdiction. Thus, we do not address that issue. See *State* v. *Waz*, 240 Conn. 365, 371 n.11, 692 A.2d 1217 (1997) (declining to address implication by state, which was not briefed, that defendant may not have had standing to challenge police search of parcel that contained illegal drugs).

[13] Our conclusion that the Appellate Court lacked subject matter jurisdiction over the writ of error because the underlying order from which the writ arose did not constitute a final judgment necessarily means that there was a lack of a final judgment when the writ originally was filed with this court. Thus, we could have dismissed the writ ourselves when it originally was filed with this court. Rather, this court transferred the writ of error and motion to dismiss that writ to the Appellate Court, pursuant to § 51-199 (c), which expressly permitted this court to transfer this "cause" to the Appellate Court and extended jurisdiction to the Appellate Court to decide the motion to dismiss. See *State* v. *McCahill*, 261 Conn. 492, 503, 811 A.2d 667 (2002) ("our transfer authority by way of § 51-199 [c] is not limited to a formal appeal, but encompasses causes"). In light of this transfer, we conclude that the appropriate course of action is to remand the case to the Appellate Court with direction to dismiss the appeal for lack of subject matter jurisdiction. See *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007) ("in a certified appeal, the focus of our review is not the actions of the trial court, but . . . on the judgment of the Appellate Court" [citations omitted; internal quotation marks omitted]). Finally, because we determine that the Appellate Court lacked subject matter jurisdiction over the writ, we do not reach the issues raised in the first two certified questions, as the Appellate Court was without authority to determine that Connecticut recognizes an unretained expert privilege. See *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 315, 968 A.2d 396 (2009) ("[a] court lacks discretion to consider the merits of a case over which it is without jurisdiction" [internal quotation marks omitted]).